

# Bernard Grossberg
Attorney at Law

99 Summer Street
Suite 1800
Boston, Massachusetts 02110
(617) 737-8558
Fax 737-8223

January 29, 2007

**BY FAX AND MAIL**

Richard Rinaldi
United States Probation Officer
United States Probation
Federal Building & Courthouse
1550 Main Street
Springfield, MA 01103

    Re:    **UNITED STATES V. JOSEPH ASSELIN**
            No. 04-CR-30033-09-MAP

Dear Mr. Rinaldi:

    As you may recall, I represent the defendant in the above-entitled matter. Please be advised that I reviewed the Presentence Report that you prepared with the defendant; however, because of the holidays and the extensive nature of the report, it took several meetings with the defendant to do so. In particular, the PSI report, which consists of 77 pages and 356 paragraphs, was mailed to me on or about December 15, 2006; however, because of the holidays, I did not receive the report until January 2, 2007. In addition, I was not able to forward the report to the defendant until that date and he received the report on or about January 4, 2007. Subsequently, I and the defendant personally met on several occasions and conferred by telephone to discuss the report and our response. Because of my schedule and other commitments; however, we were not able to complete our review until this date. Moreover, based on our discussions, I requested the defendant to obtain certain documentation which necessitated additional time. I am sincerely sorry for the delay in forwarding this letter to you and I trust that the delay will not inconvenience the Court or your office.

    I would greatly appreciate it if you would give the following comments and objections to the report your most serious consideration:

    ¶30  The defendant did not know that his father Raymond Asselin, Sr. was SHA's Chief Contracting Officer and he did not know the role that his father played in procurement.

1

¶31  The defendant did not know that his father Raymond Asselin, Sr. or Arthur Stotrion instructed their staff to falsifying SHA records or that HLD exercised less oversight and ordered fewer credits than they ordinarily would have.

¶32  The defendant did not know the amount of the contracts that Baribeau and/or G&R received from SHA.

¶33  The defendant did not know the amount of the contrasts that Nicholas Katsounakis and/or Manny's Plumbing and Heating, Inc. received from SHA or that in 1998 MPH and G&R formed a joint venture; the defendant believed that MPH received approximately 1.8 million from SHA.

¶34  The defendant did not know the amount of the contracts that Peter Davis and/or P.J. Richfield received from SHA; he was only aware of the fact that Peter Davis and P.J. Richfield received contracts and payments from SHA.

¶35  The defendant did not know the amount of the contracts that John Spano and/or Valley Floor Covering received from SHA or that John Spano and/or Valley Floor Covering was a subcontractor to G&R, MPH and other SHA vendors.

¶36  The defendant did not know Paul Bannick and only recalls that he may have met him on one occasion at a golf tournament.

¶37  The defendant did not know the purpose of a corporation called Oak Pond Farms, Inc. or that Oak Pond Farms, Inc received funds from SHA.

¶38  The defendant did not know Donato Rizzoco.

¶39  The defendant did not know Frank Ware or that the Ware Group received funds from SHA and only recalls that he may have met Frank Ware on one occasion at a fund raiser for his brother Christopher Asselin.

¶40  The defendant did not know Paul Bates or Airtite Windows.

¶41  The defendant did not know that in 2002, his mother Janet Asselin, took over the bookkeeping duties of the "Committee to elect Christopher Asselin" and he believed that his sister performed those duties.

¶44  The defendant began working at Palmer Goodell Insurance Agency, Inc. in 1991 not 1994.

¶47  The defendant did not know that Gary Baribeau and/or G&R was doing business with SHA since approximately 1986, but rather since 1996; the defendant believed that his father, Raymond Asselin, Sr. and Arthur Sotirion were doing consulting work for G&R.

¶48  The defendant has no knowledge of these assertions except that after his brother died, the defendant's father Raymond Asselin, Sr., and Arthur Sotirion, were helping Gary Baribeau drafts bids.

¶49  The defendant did not know that G&R was paying the Asselins and/or Sotirion family bills; the defendant knew that the invoice he received for construction of a shed at his home was forwarded for payment to G&R which was the first notification he received that G&R paid such family bills.

¶50  The defendant had no knowledge of the "R factor" or the "A factor".

¶51  The defendant had no knowledge of these assertions.

¶52  The defendant had no knowledge of these assertions.

¶53  The defendant had no knowledge of these assertions.

¶54  The defendant had no knowledge of these assertions.

¶55  The defendant had no knowledge of these assertions.

¶56  The defendant had no knowledge of these assertions.

¶57  The defendant had no knowledge of these assertions.

¶58  The defendant had no knowledge of these assertions.

¶59 to ¶73  The defendant knew that Nick Katsounakis was the owner of MPH; the defendant did not know the extent or nature of MPH work for SHA; the defendant knew that MPH did work for his father, Raymond Asselin, Sr.; the defendant had no knowledge of the other assertions.

¶74  The defendant's father, Raymond Asselin, Sr., did not give the defendant $20,000 as seed money to start P.J. Richfield; the defendant's father Raymond Asselin, Sr., gave the defendant $20,000 to purchase properties for development which was not related in any regard to P.J. Richfield; the defendant borrowed the $20,000 from his father Raymond Asselin, Sr., to purchase two lots and thereafter, received bank financing to complete the purchase.

¶76  The loan that the defendant received from his father Raymond Asselin, Sr. was not to help start P.J. Richfield and therefore, there was no conflict.

¶77  In late 1989 or early 1990, not 1990 or 1991, and not to recoup his $20,000 investment and to provide Davis business, Raymond Asselin, Sr. recommended to the defendant and Davis that Davis pay the defendant finder's fees and consultant fees, not cash kickbacks for business that the defendant could steer to Davis. The defendant obtained jobs for Davis and the defendant received commissions for finding the Suffield Bank job for Davis. The fees that the defendant received has nothing to do with P.J. Richfield; no money was used for SHA bids to satisfy, the $20,000 loan that the defendant received from his father, Joseph Asselin, Sr. The defendant paid his father for the $20,000 personal loan which the defendant used to purchase property in Holyoke and Ludlow, MA.

¶78  The defendant has no knowledge of these assertions.

¶79  The defendant has no knowledge of these assertions.

¶80  The defendant has no knowledge of these assertions.

¶81  The defendant has no knowledge of these assertions.

¶82  The defendant has no knowledge of these assertions.

¶83  The defendant has no knowledge of these assertions.

¶84  The defendant has no knowledge of these assertions.

¶85  The defendant has no knowledge of these assertions.

¶86  The defendant has no knowledge of these assertions.

¶87  The defendant has no knowledge of these assertions.

¶90  The defendant is uncertain and has no specific knowledge as to what occurred at the residence of Christopher and Merylina Asselin.

¶91  The defendant knew that John Spano was the owner of Valley Floor Covering and that he did business with SHA; the defendant had no knowledge of the other assertions.

¶92  The defendant knew that John Spano had carpeted the Cape home; the defendant had no knowledge of how Spano was paid.

¶93  The defendant has no knowledge of these assertions.

¶94　The defendant has no knowledge of these assertions.

¶95　The defendant has no knowledge of what the other persons knew.

¶96　The defendant has no knowledge of what the other persons knew.

¶97　The defendant knew that Fran Maroney was the purchasing agent at SHA; the defendant had no knowledge of his level of authority.

¶98　The defendant has no knowledge of these assertions.

¶99　The defendant had no knowledge of these assertions; the defendant heard, however, through family discussions that Maroney was helped by this father, Raymond Asselin, Sr. not at that time, but as the investigation of this matter proceeded.

¶100　The defendant had no knowledge of these assertions.

¶101　The defendant had no knowledge of these assertions, the defendant did not know what invoices went to Spano's place of business as the defendant did not send out the invoices.

¶102　The defendant had no knowledge of these assertions except that Spano installed the carpeting.

¶103　The defendant had no knowledge of these assertions.

¶104　The defendant did not know Paul Bannick and only recalls meeting him a few times in passing at golf tournaments.

¶105　The defendant had no knowledge of these assertions.

¶106　The defendant had no knowledge of these assertions.

¶107　The defendant had no knowledge of these assertions.

¶108　The defendant had no knowledge of these assertions.

¶109　The defendant had no knowledge of these assertions.

¶110　The defendant had no knowledge of these assertions.

¶111　The defendant had no knowledge of these assertions.

¶112   The defendant had no knowledge of these assertions.

¶113   The defendant had no knowledge of these assertions.

¶114   The defendant had no knowledge of these assertions.

¶116   The defendant knew that William Pappas was the uncle of Robert Khninicki; the defendant did not know that Khninicki and his staff certified bills and contracts.

¶117   The defendant knew that William Pappas established a trust; however, the defendant did not know details of the trust.

¶118   The defendant had no knowledge of these assertions.

¶121   The defendant had no knowledge of these assertions.

¶122   The defendant had no knowledge of these assertions; the defendant only knew that Pappas owned Oak Pond Farms

¶123   The defendant had no knowledge of these assertions.

¶124   The defendant had no knowledge of these assertions.

¶125   The defendant had no knowledge of these assertions.

¶126   The defendant purchased the land at 518 Old Farms Road, Amherst, MA at auction; the defendant borrowed the $52,500 down payment from his father, Raymond Asselin, Sr., and the only information or understanding that the defendant had was that the money came from his father. Attached hereto are copies of check no. 0209 dated 5/7/97 in the amount of $52,500 payable to the defendant drawn on the account of Raymond B. Asselin, Sr. and Janet Asselin with the notation "loan Amherst". The copy of the back of the check indicates that it was endorsed by the defendant on 5/8/97 and deposited in his account. The defendant repaid his father for this loan and also attached is a copy of a deposit slip dated 6/15/98 in the amount of $52,500, which is the repayment made by the defendant and deposited in his father's account.

¶127   The defendant has no knowledge of these assertions.

¶128   The defendant did not know Donate Rizzolo; and the defendant has no knowledge of these assertions.

¶129   The defendant has no knowledge of these assertions.

¶130  The defendant has no knowledge of these assertions.

¶131  The defendant has no knowledge of these assertions.

¶132  The defendant has no knowledge of these assertions.

¶133  The defendant has no knowledge of these assertions.

¶134  The defendant has no knowledge of these assertions.

¶135  The defendant has no knowledge of these assertions.

¶136  The defendant has no knowledge of these assertions.

¶137  The defendant knew that Gerald Ledger owned and operated Ledger Electric, Inc. and that he did work for SHA; the defendant did not know that Ledger did work on the residence of Christopher Asselin.

¶138  The defendant has no knowledge of these assertions.

¶139  The defendant does not recall receiving a bill from Ledger; the defendant's father Raymond Asselin, Sr., informed the defendant that he took care of the bill.

¶140  The defendant has no knowledge of these assertions.

¶141  The defendant has no knowledge of these assertions.

¶142  The defendant had no knowledge of these assertions regarding the pool until after the investigation of this matter proceeded when he was informed by his brother Christopher Asselin that Ledger performed the work.

¶143  The defendant had no knowledge that the F.B.I. executed a search warrant at Christopher Asselin's home and found an invoice from Ledger; the defendant knew that Ledger pulled the permits for his home and that Ledger performed the electrical work on his home.

¶146  In 1999, a subsidiary of Palmer Goodell was spun off called Consolidated Health Plans, at that time the defendant requested Claude Labrie to give him commissions for the work he obtained for Consolidated; the commissions were not paid to the defendant so that Labrie could keep Palmer Goodell's business; the defendant did not know that Sotirion told Labrie that he had to pay the defendant in order to keep Palmer Goodell's business.

¶147  The defendant believed that the commissions that he received from Labrie were commissions for business that the defendant obtained for Consolidated.

7

¶148  The defendant has no knowledge of these assertions.

¶149  The defendant has no knowledge of these assertions; the defendant was not informed of any such assertions by Robert Carnevale; and the payments were for commissions for business he obtained for Consolidated.

¶150  The defendant knew that William Porfilo did business with SHA; the defendant did not know the volume of that business.

¶151  The defendant has no knowledge of these assertions.

¶152  The defendant has no knowledge of these assertions.

¶153  The defendant has no knowledge of these assertions.

¶154  The defendant has no knowledge of these assertions.

¶155  The defendant has no knowledge of these assertions.

¶156  The defendant has no knowledge of these assertions.

¶157  The defendant has no knowledge of these assertions.

¶158  The defendant knew that Porfilio did business for SHA; the quote project for Palmer Goodell and the defendant's home was less than the other quotes for these jobs.

¶159  The defendant has no knowledge of these assertions.

¶160  The defendant has no knowledge of these assertions; the defendant only knew that Frank Ware had played football with him in high school and he had met him at a fund raiser.

¶161  The defendant has no knowledge of these assertions.

¶162  The defendant has no knowledge of these assertions.

¶163  The defendant has no knowledge of these assertions.

¶164  The defendant has no knowledge of these assertions.

¶165  The defendant has no knowledge of these assertions.

¶166  The defendant has no knowledge of these assertions.

¶167  The defendant has no knowledge of these assertions.

¶168  The defendant has no knowledge of these assertions.

¶169  The defendant has no knowledge of these assertions.

¶170  The defendant has no knowledge of these assertions.

¶171  The defendant has no knowledge of these assertions.

¶172  The defendant has no knowledge of these assertions.

¶173  The defendant has no knowledge of these assertions.

¶174  The defendant has no knowledge of these assertions.

¶175  The defendant has no knowledge of these assertions.

¶176  The defendant has no knowledge of these assertions.

¶177  The defendant has no knowledge of these assertions.

¶178  The defendant did not know Paul Bates; the defendant has no knowledge of these assertions.

¶179  The defendant has no knowledge of these assertions.

¶180  The defendant has no knowledge of these assertions.
¶181  The defendant has no knowledge of these assertions.

¶182  The defendant has no knowledge of these assertions.

¶183  The defendant has no knowledge of these assertions.

¶184  The defendant has no knowledge of these assertions.

¶185  The defendant has no knowledge of these assertions.

¶186  The defendant has no knowledge of these assertions.

¶187  The defendant has no knowledge of these assertions.

¶188  The correct names is First American Insurance Agency

¶189 During August of 2000, Edward Murphy first contacted the defendant regarding the purchase of the Chaffee Helliwell Insurance Agency. Edward Murphy was aware of the fact that the defendant wanted to leave his job at Palmer Goodell as the company had been bought out; the CFO position was transferred to Maine and the defendant did not want to move to Maine.

¶190 The defendant had no knowledge that in June of 2002, Edward Murphy received a check from MPH or a check from Hilltop Construction, Inc. It was the defendant's understanding that the checks were from investors in Chaffee-Helliwell. The defendant was aware that he had to have investors who were willing to make a total investment of $300,000. The defendant obtained three (3) investors G&R, MPH and Hilltop and the defendant was not aware that they had given checks to Edward Murphy. The only funds that the defendant was aware of that changed hands was from G&R and the defendant did not need additional funds at that time.

¶192 The defendant began working at Chaffee-Helliwell on July 1, 2002 as the "deal" was scheduled to close on that date; however, it took from July 1, 2002 to September 12, 2002 for Chaffee-Helliwell's banks to get things in order so as to pay the lien holders. Consequently, the purchase price was re-negotiated and the purchase of the building was removed from the "deal". The defendant began managing and running the company as of July 1, 2002 and he was responsible for its profit and loss as of that date.

¶193 The defendant was aware only of the Baribeau check because he was present when he gave him the check. The defendant only knew that Baribeau was an investor or partner in the company and he had no knowledge that the check was part of a "shakedown".

¶194 The defendant believed that his father, Raymond Asselin, Sr., received items from Fran Maroney by use of the SHA discount and that his father paid for these items. The defendant did not know that these items were billed to SHA.

¶195 The defendant has no knowledge of these assertions.

¶196 The defendant has no knowledge of these assertions.

¶197 The defendant has no knowledge of these assertions.

¶198 It was the defendant's understanding that sometimes members of his family purchased items using the SHA discount from vendors; however, the defendant did not know that such purchases were billed to SHA.

¶199 The defendant has no knowledge of these assertions.

¶200  The defendant has no knowledge of these assertions.

¶201  The defendant was aware of the fact that his mother Janet Asselin was unhappy about certain plates; however, the defendant did not know that the purchase of the plates was billed to SHA.

¶202  The defendant has no knowledge of these assertions.

¶203  The defendant has no knowledge of these assertions.

¶204  The defendant has no knowledge of these assertions.

¶205  The defendant has no knowledge of these assertions and he did not know of the use of the basket.

¶206  The defendant has no knowledge of these assertions and in particular, he was not required to attend Sunday dinners; the defendant's family did not attend the dinners on a regular basis or as often as other family members did.

¶207  The defendant's wife, Melinda Asselin, complaint about a banister at dinner and elsewhere and that she wanted to have the banisters re-done. The defendant contracted to have the banisters re-done not by an SHA employee, but by Alan Toussain and paid for the replacement banister. The defendant has no knowledge of a telephone call by Ann Asselin.

¶208  The defendant has no knowledge of these assertions.

¶209  The defendant has no knowledge of these assertions.

¶210  The defendant was not present at this conversation.

¶211  The defendant has no knowledge of these assertions.

¶212  The defendant has no knowledge of these assertions.

¶213  The defendant has no knowledge of these assertions.

¶214  The defendant has no knowledge of these assertions.

¶215  The defendant has no knowledge of these assertions.

¶216  The defendant has no knowledge of these assertions.

¶217  Jimmy Hulse, Ray Descoteau and Frank Higginbotham, performed work at the defendant's home; on those occasions, they were not wearing SHA uniforms

11

or clothes and it was the defendant's understanding that they were not on SHA time. They stated that the defendant's father, Raymond Asselin, Sr., would take care of them regarding their being paid.

¶218  The defendant believed that the workers were performing the work on their own time and that they were paid by his father, Raymond Asselin, Sr., on the side for such work.

¶219  The defendant has no knowledge of these assertions.

¶220  The defendant offered to pay Jimmy Hulse and Ray Descoteau cash; however, they stated that the defendant's father, Raymond Asselin, Sr., was taking care of it.

¶221  The defendant has no knowledge of these assertions.

¶222  The defendant has no knowledge of these assertions.

¶223  The defendant has no knowledge of these assertions.

¶224  The defendant has no knowledge of these assertions.

¶225  The defendant has no knowledge of these assertions.

¶226  The defendant has no knowledge of these assertions.

¶227  The defendant has no knowledge of these assertions.

¶228  The defendant has no knowledge of these assertions and it was his understanding that Lisa Asselin did the bookkeeping for Christopher Asselin's campaign.

¶229  The defendant has no knowledge of these assertions.

¶230  The defendant has no knowledge of these assertions.

¶231  The defendant has no knowledge of these assertions.

¶232  The defendant has no knowledge of these assertions.

¶233  The defendant has no knowledge of these assertions.

¶234  The defendant has no knowledge of these assertions.

¶235  The defendant has no knowledge of these assertions except that he was aware that Holmes transported SHA residents.

¶237  The defendant has no knowledge of these assertions.

¶238  The defendant does not dispute these allegations; however, the ideas that were discussed to account for the funds were not put into effect. Moreover, there was no scheme, but only discussions and at the time, the defendant had no awareness that his actions were unlawful.

¶239  The defendant does not dispute these allegations; however, the ideas that were discussed to account for the funds were not put into effect. Moreover, there was no scheme, but only discussions and at the time, the defendant had no awareness that his actions were unlawful.

¶240  The defendant does not dispute these allegations; however, the ideas that were discussed to account for the funds were not put into effect. Moreover, there was no scheme, but only discussions and at the time, the defendant had no awareness that his actions were unlawful.

¶241  The defendant has no knowledge of these assertions.

¶242  The defendant has no knowledge of these assertions.

¶243  The defendant has no knowledge of these assertions.

¶244  The defendant has no knowledge of these assertions.

¶245  The defendant has no knowledge of these assertions.

¶246  The defendant has no knowledge of these assertions.

¶247  The defendant has no knowledge of these assertions.

¶248  The defendant has no knowledge of these assertions.

¶249  The defendant has no knowledge of these assertions.

¶250  The defendant has no knowledge of these assertions.

¶251  The defendant has no knowledge of these assertions.

¶252  The defendant has no knowledge of these assertions.

¶253 The defendant's brother, James Asselin did not advise or inform the defendant to throw out anything relating to SHA and he did not disgard any items. The defendant had no knowledge of these assertions until after the investigation commenced.

¶256 The defendant has no knowledge of these assertions.

¶257 The defendant has no knowledge of these assertions.

¶258 The defendant has no knowledge of these assertions.

¶259 The defendant has no knowledge of these assertions.

¶260 The defendant has no knowledge of these assertions.

¶261 The defendant did not know of this conversation and the defendant's father, Raymond Asselin, Sr., did not ask him to lie.

¶262 The defendant has no knowledge of these assertions.

¶263 The defendant has no knowledge of these assertions.

¶264 The defendant has no knowledge of these assertions.

¶265 The defendant has no knowledge of these assertions.

¶266 The defendant has no knowledge of these assertions.

¶267 The defendant was aware of the subpoena; however, he had no knowledge of the conversation.

¶268 The defendant did not know that Peter Davis had been contacted; however, the defendant was aware of the payments.

¶269 The defendant became aware after he was indicted that Peter Davis made these demands.

¶270 The defendant has no knowledge of these assertions.

¶271 The defendant has no knowledge of these assertions.

¶272  The unlawful benefits that the defendant received consisted of the following:

| | | | |
|---|---|---|---|
| 1. | 450.00 | survey work | G&R |
| 2. | 330.00 | survey work | G&R |
| 3. | 18,100.00 | lumber/mat | G&R |
| 4. | 5,500.00 | labor framing | G&R |
| 5. | 4,030.00 | concrete work | G&R |
| 6. | 7,690.57 | kitchen cabinets | G&R |
| 7. | 6,003.90 | counter tops | G&R |
| 8. | 2,518.40 | topsail | G&R |
| 9. | 225.00 | bulldozer | G&R |
| 10. | 7,500.00 | driveway | G&R |
| 11. | 800.00 | mirrors | G&R |
| 12. | 5,000.00 | trim wchris | G&R |
| 13. | 4,150.00 | shed | G&R |
| 14. | 100,000.00 | chi * | G&R **returned** |
| 15. | 10,201.52 | plumbing house | Manny |
| 16. | 1,000.00 | heating air | Manny |
| 17. | 27,450.00 | loan pg | Manny |
| 18. | 122,800.00 | chi * | Manny **returned** |
| 19. | 7,400.00 | framing labor | PJ |
| 20. | 8,200.00 | lumber/mat | PJ |
| 21. | 11,600.00 | lumber/mat | PJ |
| 22. | 12,400.00 | framing labor | PJ |
| 23. | 6,000.00 | brickwork | PJ |
| 24. | 7,925.00 | lumber/mat | PJ |
| 25. | 3,900.00 | lumber/mat | PJ |
| 26. | 2,295.00 | carpet | Spano |
| 27. | 52,500.00 | land * | Pappas **(from father not Pappas)** |
| 28. | 27,300.00 | chi * | Hilltop **returned** |
| 29. | 24,300.00 | chi * | Hilltop **returned** |
| 30. | 7,000.00 | electrical | Ledger |
| 31. | 1,890.00 | printing * | **Pynchon}commissions** |
| 32. | 2,100.00 | printing * | **Pynchon}commissions** |
| 33. | 2,025.00 | printing * | **Pynchon}commissions** |
| 34. | 1,785.00 | printing * | **Pynchon}commissions** |
| 35. | 1,025.94 | ceramic tile | SHA |
| 36. | 1,094.25 | light fixtures | SHA |
| 37. | 780.00 | light fixtures | SHA |
| 38. | 470.00 | light fixtures | SHA |
| 39. | 634.50 | light fixtures | SHA |
| 40. | 1,750.00 | oak flooring | SHA |
| 41. | 167.80 | light fixtures | SHA |
| 42. | 109.87 | light fixtures | SHA |

15

|     |              |        |
|-----|--------------|--------|
| 43. | 2,295.00 flooring | Valley |
| 44. |              |        |
| 45. |              |        |

¶273   The defendant's version of the offenses as follows:

My role in the family is and has been different than portrayed in the media and by the U.S. Attorney's Office. I had been somewhat removed from the day-to-day, week-to-week interaction of the family. I have and continue to admit guilt and feel sorrow to those I have hurt. I will spend the rest of my life with this guilt. My house, the postage for my brother's campaign, loan to my father for his car and other isolated issues comprise my involvement. I was not "a player" in the family's activities.

In the mid 1980's, my involvement with my father and his friends started with a very legitimate business deal. I was getting involved in Real Estate Development. This began my relationship with Peter Davis. Toward the late 80's, I got married and started my family. I went on my own and purchased real estate for speculation and eventually built my own house, located at 421 Homestead Aveune, Holyoke, MA. This was in the 1988-1989 time frame. Everything in that house was purchased by me. My father did not offer nor did I ask for help. I used vendors I knew from my business dealing with PJ Richfield and others. These included Manny Plumbing, Springfield Lumber, Toussaint Brothers, Matus Masonry and G&R construction. Everything was paid by me. The only items I didn't pay for was the removal of a large tree and site work in my back yard in the early 90's and the interior painting of my house once in the mid 90's. I did offer to pay for this and the painter said my father took care of it. Both I considered as gifts from my father.

My parents' giving me gifts and other items was not unusual for me. I received a large cash wedding gift, a loan to purchase my first new van (my father later forgave payment), a loan to buy my first real estate on my own. I received a lawnmower and a snow blower and other gifts. I knew they were purchased through Springfield Housing Authority, but was told and believed my father paid for these but "got his discount". I realize this was wrong.

As the FBI tapes will show, my wife and I were not with the family as much as the rest of my brothers and sister. I was not aware of "things" going on with the family. My wife and I didn't know of "the basket". I would stop by to visit. I would hear about projects and find out things that were being done. Except for my sisters landscaping at her house that PJ Richfield did, I was out of the loop. I didn't even know that PJ Richfield did work at my brother Chris's house at the same time PJ did work at my house in Amherst.

16

My house in Amherst started in 1997. My father first approached me with Peter Davis and said he could help. I accepted and this was wrong. I did not realize the scope of help I would receive. I believe that my father was due this money by these vendors. If I could do it over again, I would decline my father.

I did "learn" from my father the business culture of getting a commission on projects. I used this to benefit myself, but at the time justified my actions by getting the prices below budget for Palmer Goodell and gave the work to businesses that would give me a "commission". I delayed the billing of the political postage in trying to help my brother. But ultimately, did bill him and he paid Palmer Goodell what they were owed.

I have taught my children differently. They know right from wrong, no grey.

The purchase of my current business was with my brother Ray's investment, bank loans, my personal investment and my sister's loan. The company is 100% legal. Initially, I was purchasing the business with partners including Eddie Murphy, Manny's Plumbing and G&R Construction. I was lead to believe and believed these were lawful investors. They backed out when the investigation began. I did not know they were forced to "invest" until after the investigation. On FBI Tape 13, I discuss these vendors and discuss them as investors. Eddie Murphy's deposition describes my "investors". Maybe I was naive, but I thought the "investors" were truly investors.

As I stated I am guilty, but I am different from the other persons involved in this matter. I am thoroughly humiliated by my involvement in this matter. It is difficult for me to look at my wife and children and not feel ashamed for what I did and for what I put them through. I should have known better and I am sincerely and deeply sorry for what I did.

¶280, 281, 282, 283, 284, 285, 286: The defendant submits that the following computation advises the Court of the proper sentence range under the U.S.S.G.:

- Base offense level: U.S.S.G. §2C1.7(a) . . . . 7

- Specific offense characteristics: U.S.S.G. §2C1.7(b)(1) . . . . +2

- Specific offense characteristics: U.S.S.G. §2C1.7(b)(2)(A)(ii)
  (value of gratuities)

    $510,696.13. . . .total gratuities re work on house
    -  334,700.00 . . .amounts returned prior to indictment and not included*

    $175,996.13. . . .value of gratuities

17

   2B1.1(b)(1)(F) .... +10. ....more than $20,00, but less than $200,000

- Adjustment for role in offense: U.S.S.G. §3B1.2(b)
  (minimal participant) ................-4
- Adjusted offense level: ............... 15

- Acceptance of responsibility    -3

  Total Offense Level:  12

Application of U.S.S.G. §5K1.1.....offense level of no more than 6
            (i.e. at 50%)

Criminal History Category I and offense level 6 = 0 to 6 months in Zone A

   **Since the applicable guideline range is in Zone A of the Sentencing Table, a sentence of imprisonment is not required under U.S.S.G. §5C1.1(b).**

  Based on the defendant's role in the offense, the offense level should be decreased by 4 levels as the defendant was a minimal participant in the charged criminal activity. The defendant is subsequently less culpable than the average participant and he is plainly among the least culpable of those involved in the conduct of the group. Firstly, as indicated by the defendant's responses above, "...the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant." U.S.S.G. 3B1.2(b), Application Note 4. Almost all of the unlawful gratuities that the defendant received, pertained to the building of his house in 1997. The initial and smaller gratuities, appeared to be gifts from the defendant's father to assist him in building his house; however, the defendant acknowledges that he did not question the original benefits or gratuities that he received, that he should have done so and declined the offers. The defendant was aware from his father of the nature of the gratuities from G&R and Peter J. Richfield. Unlike the others in the defendant's group of "siblings", the defendant was not involved in politics nor did he run a political campaign for either of his brothers who were involved in political activities. In addition, the defendant believed that the purchase of the Chaffe-Helliwell Insurance Agency was to be a legitimate enterprise and that the checks that were received were from investors in the agency. The defendant obtained three investors, G&R, MPH and Hilltop and he was not aware that they had given checks to Edward Murphy. The only funds that the defendant was aware of that changed hands were from G&R and in fact, the defendant did not need additional funds at that time. The defendant had no knowledge of the funds received by Murphy, or that these funds were not investments, but rather the proceeds of "shakedowns" by his father and all such funds were returned and they did not contribute to the defendant's purchase of the Insurance Agency. It must also be noted that during the entire course of the investigation by the means of intercepted conversations among family members, the defendant was not involved in those discussions. At best, of all of the 70 or so tapes, the defendant appears in 2 or 3 of

18

the intercepted conversations. Most crucially, the defendant was not involved in the integral activities of the Asselin family; he did not participate on a regular basis in the Sunday dinners; he had no knowledge of the "basket" procedure utilized by his father to request "gratuities" and he and his family, were distanced from the rest of the family, both geographically and by design. At best, the defendant was on the periphery of the family and a minimal participant in the over-all charged activity of the family.

Thank you for your consideration of the above.

Sincerely,

Bernard Grossberg

BG/cak

Enclosures

cc: Kevin O'Regan, Esq.
Joseph Asselin