UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.    ) | Criminal No. 04-30033-9-MAP |
| ) | |
| JOSEPH ASSELIN    ) | |
| ) | |

**DEFENDANT JOSEPH ASSELIN'S SENTENCING MEMORANDUM**

The defendant, Joseph Asselin, entered guilty pleas before this Court, Ponsor, J., to Counts 35 and 85 of a Superceding Indictment, which charges him with the offenses of conspiracy to commit receipt of gratuities in violation of 18 U.S.C. §201 and conspiracy to commit theft in violation of 18 U.S.C. §371 and 641. The defendant provided substantial assistance to the government in the investigation and prosecution of another person (i.e. Peter Davis), who had committed an offense(s) and the defendant expects the government to file a motion certifying that he has provided substantial assistance. Therefore, in accordance with U.S.S.G. §5K1.1, this Court may depart downward from the advisory guidelines.

**I. The Defendant's Sentence Recommendation**

Pursuant to 18 U.S.S.G. §3561(a), the defendant is eligible for probation. Moreover and most crucially, as stated infra at 9, the calculation under the United States Sentencing Guidelines, with application of the government's motion pursuant to U.S.S.G. §5K1.1, advises that a sentence of imprisonment is not required under U.S.S.G. §5C1.1(b). Therefore, the defendant respectfully submits that this Court impose the following sentence on each count to be served concurrently with one another:

1

- Probation for a period of 36 months

- Mandatory conditions of probation pursuant to 18 U.S.C. §3563(a)

- Discretionary or special conditions of probation pursuant to 18 U.S.C. §3563(b), including:

    (a) Home confinement at the defendant's place of residence during non-working hours and if this Court finds it appropriate, that compliance with this condition be monitored by telephonic or electronic signaling devices, for a period of 6 to 9 months during the first year of the defendant's probation.

    (b) Work in community service for 1000 hours or for an amount of time designated by the Court at Open Pantry Community Services, Inc., a private non-profit social services agency, which provides comprehensive services to people who are homeless, hungry, or disadvantaged throughout the city of Springfield, MA., or at another appropriate program designated by the Court. [1]

    (c) In accordance with his Plea Agreement with the government dated September 13, 2006, the defendant transfer and otherwise forfeit any and all interest he may have in the real property located at 56 Stage Island Road, Chatham, MA.

    (d) In accordance with the Plea Agreement with the government dated September 13, 2006, that the defendant pay the government his share of the equity in his residence located at 518 Old Farm Road, Amherst, MA. [2]

---

[1] The defendant has been interviewed by Kevin Noonan, the Executive Director of Open Pantry Community Services, Inc., who is aware of his convictions herein and who has indicated that the defendant would be accepted to serve his community service at that program.

[2] The real property located at 56 Stage Island Road, Chatham, MA., has an approximate fair market value of 3.5 million and the defendant's 1/5 share is therefore approximately $700,000.00. The defendant's residence at 518 Old Farm Road, Amherst, MA., has an approximate fair market value of $535,000.00 and liens in the approximate amount of $246,570.00  The defendant's share of the equity in his residence amounts to approximately 144,215.  The defendant will forfeit and pay to the government the total amount of approximately $844,215.00

It must also be noted that at the time of the defendant's arrest in July of 2004, the liens or mortgages on the defendant's residence totaled approximately $414.427.00, whereas, as of the date of the entry of the defendant's guilty pleas in September of 2006, the defendant had reduced the outstanding mortgages to approximately $246,570.00 and the defendant's equity in his home has increased to the benefit of the government.

## II. Collateral Consequences

Pursuant to §5K2.0 of the U.S.S.G., any case may involve factors in addition to those identified that have not been given adequate consideration by the Sentencing Commission. The presence of any such factor may warrant departure from the Guidelines under some circumstances and in the discretion of the sentencing court. In the instant case, the defendant demonstrated his remorse not only by his entry of timely guilty pleas, but also by offering to cooperate with the government. The defendant provided full and open accountings of his involvement in the charged offenses, as well as, the involvement of others during the course of numerous proffer sessions with representatives of the government. The defendant's remorse is demonstrated not only in words, but also by his behavior in testifying at the trial of co-defendant Peter Davis. Such cooperation with the government has exposed the defendant and his family to more severe collateral consequences beyond the fact of the prosecution itself.

The defendant and his wife, Melinda Asselin, have been married for eighteen years and they are the parents of four children ages 16, 14, 12 and 11. The instant prosecution caused tremendous strain on the defendant's marriage which necessitated marriage counseling with their parish priest. The publication and embarrassment created by the case also effected the defendant's relationships with his children who also endured those effects. The defendant and his wife were deeply involved in their local church as both members and leaders of the congregation. After the return of the original indictment, the defendant's wife was requested by the religious education coordinator of the church to resign from her CCD teaching position. This event and similar instances in their community, created great stress on the defendant's marriage. A further consequence

of the prosecution was its effect on the defendant's ability to discipline his children who occasionally "rebelled" or deflected his fatherly intervention in their lives by referring to his legal situation. These consequences were increased by the publicity created by the defendant's testimony at the trial of Peter Davis. The defendant and his wife are supportive of each other and are presently coping with the defendant's uncertain future; however, incarceration will severely test their marriage and place additional stress on their relationship with their children.

A most pronounced consequence of the prosecution of the defendant has been on his business. The defendant is the principal owner and the operator of the Chaffee-Helliwell Insurance Agency. The company presently has ten (10) employees and it is striving to remain in business. After the return of the original indictment, the defendant began to lose business, most notably, his commercial clients. This loss was exacerbated after the defendant's cooperation with the government was publicized. The defendant estimates that his business has suffered a 20% reduction in its commercial business as a result of his prosecution and cooperation. Numerous commercial clients informed the defendant that given his "legal situation", they could not continue to do business or "deal" with his agency. In addition, this problem was compounded by the fact that several insurance carriers, who issued insurance policies for the defendant's agency, cancelled their "appointments" with the agency. The loss of the agency's ability to issue policies for major insurance carriers also, in turn, effected the defendant's ability to attract new carriers, which remains an on-going process.

The Chaffee-Helliwell Insurance Agency operates under a corporate license issued by the Massachusetts Division of Insurance. The defendant works as an insurance

broker pursuant to a personal Producer's license issued by the Massachusetts Division of Insurance. Although both the insurance agency and the defendant have applied for renewals of their respective licenses and they have been allowed to continue to operate in the Commonwealth, the renewal of each license is on hold.

It is the defendant's understanding that the renewals of the licenses depends on the disposition of this matter and although the defendant will be a convicted felon, the Division of Insurance has the discretion to reissue the licenses. If, however, the defendant is sentenced to a term of imprisonment, it is extremely unlikely that either license will be renewed. Since the agency is operated under these licenses, it will close and ten employees will lose their jobs if the licenses are not renewed. In such a circumstance, the agency would have no value for a sale if its license to operate and insurance carrier appointments are simultaneously lost. Should this Court deem it appropriate to adopt the defendant's sentence recommendation, the defendant sincerely believes that the Division of Insurance will issue the necessary licensure and that the agency will be able to continue to remain in business.

### III. The Defendant's Sentence Calculation

The defendant respectfully submits that the unlawful gratuities that he received consisted of the following:

| | | | |
|---|---|---|---|
| 1. | 450.00 | survey work | G&R |
| 2. | 330.00 | survey work | G&R |
| 3. | 18,100.00 | lumber/mat | G&R |
| 4. | 5,500.00 | labor framing | G&R |
| 5. | 4,030.00 | concrete work | G&R |
| 6. | 7,690.57 | kitchen cabinets | G&R |
| 7. | 6,003.90 | counter tops | G&R |
| 8. | 2,518.40 | top soil | G&R |
| 9. | 225.00 | bulldozer | G&R |

| | | |
|---|---|---|
| 10. | 7,500.00 driveway | G&R |
| 11. | 800.00 mirrors | G&R |
| 12. | 5,000.00 trim wchris | G&R |
| 13. | 4,150.00 shed | G&R |
| 14. | 100,000.00 chi * | **G&R returned** |
| 15. | 10,201.52 plumbing house | Manny |
| 16. | 1,000.00 heating air | Manny |
| 17. | 27,450.00 loan pg | Manny |
| 18. | 122,800.00 chi * | Manny **returned** |
| 19. | 7,400.00 framing labor | PJ |
| 20. | 8,200.00 lumber/mat | PJ |
| 21. | 11,600.00 lumber/mat | PJ |
| 22. | 12,400.00 framing labor | PJ |
| 23. | 6,000.00 brickwork | PJ |
| 24. | 7,925.00 lumber/mat | PJ |
| 25. | 3,900.00 lumber/mat | PJ |
| 26. | 2,295.00 carpet | Spano |
| 27. | 52,500.00 land * | Pappas **(from father not Pappas)** |
| 28. | 27,300.00 chi * | Hilltop **returned** |
| 29. | 24,300.00 chi * | Hilltop **returned** |
| 30. | 7,000.00 electrical | Ledger |
| 31. | 1,890.00 printing * | **Pynchon}commissions** |
| 32. | 2,100.00 printing * | **Pynchon}commissions** |
| 33. | 2,025.00 printing * | **Pynchon}commissions** |
| 34. | 1,785.00 printing * | **Pynchon}commissions** |
| 35. | 1,025.94 ceramic tile | SHA |
| 36. | 1,094.25 light fixtures | SHA |
| 37. | 780.00 light fixtures | SHA |
| 38. | 470.00 light fixtures | SHA |
| 39. | 634.50 light fixtures | SHA |
| 40. | 1,750.00 oak flooring | SHA |
| 41. | 167.80 light fixtures | SHA |
| 42. | 109.87 light fixtures | SHA |
| 43. | 2,295.00 flooring | Valley |

Item numbered 27, should not be included in the loss calculation as the defendant purchased the land at 518 Old Farms Road, Amherst, MA at auction; the defendant borrowed the $52,500 down payment from his father, Raymond Asselin, Sr., and the only information or understanding that the defendant had was that the money came from his father. The defendant submitted a copy of check no. 0209 dated 5/7/97 in the amount of

$52,500 payable to the defendant drawn on the account of Raymond B. Asselin, Sr. and Janet Asselin with the notation "loan Amherst" to the Probation Department. The copy of the back of the check indicates that it was endorsed by the defendant on 5/8/97 and deposited in his account. The defendant repaid his father for this loan and also submitted a copy of a deposit slip dated 6/15/98 in the amount of $52,500, which was the repayment made by the defendant and deposited in his father's account.

Items numbered 31, 32, 33 and 34, should not be included in the loss calculation as in 1999, a subsidiary of Palmer Goodell was spun off called Consolidated Health Plans; at that time the defendant requested Claude Labrie to give him commissions for the work he obtained for Consolidated; the commissions were not paid to the defendant so that Labrie could retain Palmer Goodell's business and the defendant did not know that Arthur Sotirion informed Labrie that he had to pay the defendant in order to retain Palmer Goodell's business. The defendant believed that the commissions that he received from Labrie were commissions for business that the defendant obtained for Consolidated.

Items numbered 14, 18, 28 and 29 should not be included in the loss calculation as during August of 2000, Edward Murphy contacted the defendant regarding the purchase of the Chaffee Helliwell Insurance Agency. Edward Murphy was aware of the fact that the defendant wanted to leave his job at Palmer Goodell as the company had been bought by another entity; the CFO position was transferred to Maine and the defendant did not want to move to Maine. The defendant had no knowledge that in June of 2002, Edward Murphy received a check from Manny's Plumbing and Heating or a check from Hilltop Construction, Inc. It was the defendant's understanding that the

checks were from investors in Chaffee-Helliwell. The defendant was aware that he had to have investors who were willing to make a total investment of $300,000. The defendant obtained three (3) investors: G&R, MPH and Hilltop and the defendant was not aware that they had forwarded checks to Edward Murphy. The only funds that the defendant was aware of that changed hands was from G&R and the defendant did not need additional funds at that time. The defendant began working at Chaffee-Helliwell on July 1, 2002 as the "deal" was scheduled to close on that date; however, it took from July 1, 2002 to September 12, 2002 for Chaffee-Helliwell's banks to pay its lien holders. Consequently, the purchase price was re-negotiated and the purchase of the building was removed from the "deal". The defendant began managing and running the company as of July 1, 2002 and he was responsible for its profit and loss as of that date. These items were returned to their respective sources.

    The defendant respectfully submits that the following computation accurately advises the Court of the proper sentence range under the U.S.S.G.:

- Base offense level: U.S.S.G. §2C1.7(a) . . . . 7

- Specific offense characteristics: U.S.S.G. §2C1.7(b)(1) . . . . +2
  (more than one gratuity)

- Specific offense characteristics: U.S.S.G. §2C1.7(b)(2)(A)(ii)
  (value of gratuities)

      $510,696.13. . . .total gratuities re work on defendant's house
  -  334,700.00 . . .amounts returned prior to indictment and not included*

      $175,996.13. . . .value of gratuities

      2B1.1(b)(1)(F) . . . . +10. . . .more than $120,000, but less than $200,000

- Adjustment for role in offense: U.S.S.G. §3B1.2(b)
  (minimal participant) . . . . . . . . . . . . . . . . .-4

- Adjusted offense level: . . . . . . . . . . . . . . . . 15

- Acceptance of responsibility                -3

- <u>Total Offense Level</u>:                          12

- Application of U.S.S.G. §5K1.1. . . . .offense level of no more than 6
  (i.e. at 50%)

- Criminal History Category I and Offense Level 6 = 0 to 6 months in Zone A

- Pursuant to U.S.S.G. §3D1.1(a), the two counts form two separate groups

which must be combined pursuant to U.S.S.G. §3D1.4.

- **Since the applicable guideline range is in Zone A of the Sentencing Table, a sentence of imprisonment is not required under U.S.S.G. §5C1.1(b).**

Based on the defendant's role in the offense, the offense level should be decreased by 4 levels as the defendant was a minimal participant in the charged criminal activity. The defendant is substantially less culpable than the average participant and he is plainly among the least culpable of those involved in the conduct of the group. Firstly, as indicated by the defendant's responses above, "…the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant." U.S.S.G. 3B1.2(b), Application Note 4. All of the unlawful gratuities that the defendant received, pertained to the building of his home in 1997. The defendant could have built his home without the involvement of his father and indeed, he had started his plans to build without his father's assistance. It is of essential importance to note that, the defendant did not approach his father for help or assistance in obtaining gratuities to build his home, rather the defendant's father came to him. The defendant should have clearly declined his father's offers; however, he did not do so and he accepted unlawful gratuities. The initial and smaller gratuities, appeared to

9

be gifts from the defendant's father to assist him in building his home; however, the defendant acknowledges that he did not question the original benefits or gratuities, that he should have done so. The defendant was aware from his father of the nature of the gratuities from G&R and P.J. Richfield. Unlike the others in the defendant's group of "siblings", the defendant did not seek or request the gratuities; he was not involved in politics; nor did he run a political campaign for either of his brothers who were involved in political activities. In addition, the defendant believed that the purchase of the Chaffe-Helliwell Insurance Agency was to be a legitimate enterprise and that the checks that were received were from investors in the agency. The defendant obtained three investors, G&R, MPH and Hilltop and he was not aware that they had given checks to Edward Murphy. The only funds that the defendant was aware of that changed hands were from G&R and in fact, the defendant did not need additional funds at that time. The defendant had no knowledge of the funds received by Murphy, or that these funds were not investments, but rather the proceeds of "shakedowns" by his father. All such funds were returned and they did not contribute to the defendant's purchase of the insurance agency. It must also be noted that during the entire course of the investigation by means of intercepted conversations among family members, the defendant was not involved in those discussions. At best, of all of the approximate 70 audio tapes, the defendant appears in 2 or 3 of the intercepted conversations.

   The defendant was not involved in the integral activities of the Asselin family; he did not participate on a regular basis in the Sunday dinners; he had no knowledge of the "basket" procedure utilized by his father to request "gratuities" and he and his family, were distanced from the rest of the family, both geographically and by design.

The defendant was on the periphery of the family and a minimal participant in the over-all charged activity of the family. The consequences of the instant prosecution on the defendant, his wife and his family have been profound and will continue to effect them. These consequences were exacerbated by the defendant's acknowledgment of remorse and well-publicized assistance to the government. **Of all the charged family participants, the defendant is the only person who came forward and substantially assisted the government.** The defendant and his unlawful activities are distinguished from his co-defendant siblings and their unlawful activities. This factor and the defendant's substantial assistance to the government, should be afforded great weight and consideration by this Court in imposing sentence on the defendant.

Respectfully submitted
By his attorney,

/s/ Bernard Grossberg

_____
Bernard Grossberg
99 Summer Street
Suite 1800
Boston, MA  02110
(617) 737-8558
B.B.O. No. 212900

CERTIFICATE OF SERVICE

I, Bernard Grossberg, hereby certify that on this 5th day of February, 2007, I have served a true copy of **Defendant Joseph Asselin's Sentencing Memorandum** upon Kevin O'Regan, Esq., Assistant United States Attorney, Office of the United States Attorney, 1550 Main Street, Room 310, Springfield, MA  01103, and upon United States Probation Officer, Richard Rinaldi, United States Probation, Federal Building & Courthouse, 1550 Main Street, Springfield, MA  01103 by pre-paid first class mail.

/s/ Bernard Grossberg

_____
Bernard Grossberg